UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Stanley Rankin,

    *Plaintiff,*

v.

Chicago Park District, J.D. Ostergaard,
and Sidney Lewis,

    *Defendants*

No. 20 CV 794

Judge Lindsay C. Jenkins

### MEMORANDUM OPINION AND ORDER

Stanley Rankin ("Rankin") brings suit against his former employer the Chicago Park District ("Park District") and Park District employees J.D. Ostergaard ("Ostergaard") and Sidney Lewis ("Lewis") for employment discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1981, 42 U.S.C. § 1983, and the Age Discrimination in Employment Act ("ADEA"). Currently before the Court is Defendants' motion for summary judgment [Dkt. 90]. The motion is granted. Judgment is entered in favor of Defendants and against Rankin on all remaining counts of Rankin's amended complaint.

## I.    Background

The following facts are taken from the parties' Local Rule 56.1 statements and attached exhibits. [See Dkts. 92, 93, 94, 95, 106.] These facts are undisputed except where a dispute is noted.

Rankin began working for the Park District in 2014 as a Seasonal Attendant. Rankin is Black and was 58 years old at the time of incidents giving rise to this lawsuit. During his employment, Rankin was a member of Service Employees

International Union Local 73 ("Union"). His employment was subject to the Union's January 1, 2019 Collective Bargaining Agreement with the Park District ("CBA"). Rankin is classified as a "career service employee." [Dkt. 92, ¶ 20.]

The Park District is a local public entity that maintains and operates over 600 parks, sports fields, beaches, museums and other facilities. The Park District's governing body is its Board of Commissioners ("Board"), which is made up of seven members. The Park District also has a Personnel Board that oversees personnel and disciplinary policy and renders final decisions in employee discipline appeals. The Personnel Board consists of two members of the Board of Commissioners, along with the Director of Human Resources ("HR"). The Park District's HR Department and HR Director are responsible for overseeing and carrying out the employment policies of the Personnel Board. They are also responsible for enforcing the provisions of the Park District's Code of Conduct and instituting discipline. HR Managers have "frontline responsibility" for resolving employee conflicts, enforcing the Park District's Code of Conduct, and initiating discipline for infractions. At all times relevant to this lawsuit, Michael Simpkins ("Simpkins") (who is Black and was born in 1961) was the Park District's HR Director. Janet Ortiz ("Ortiz") (who is Hispanic and was born in 1989) was the HR Manager responsible for employee discipline in the North Region, which includes the park where Plaintiff worked.

The employee discipline process is controlled by the Park District's Code of Conduct, Disciplinary Guidelines, and any applicable CBA. The Disciplinary Guidelines group employee misconduct into three categories, Groups "A", "B", or "C",

2

with Group A being the most serious. Pursuant to the Disciplinary Guidelines, Group A misconduct includes "committing, attempting, or threatening physical violence other than in self-defense on Park District property or while on duty". Group B misconduct includes "direct disobedience to lawful orders from a supervisor". Group C misconduct includes any "misconduct other than misconduct identified as Group A or Group B misconduct". [Dkt. 92, ¶ 14.] The CBA provides a table of penalties applicable to the groups of misconduct in the Disciplinary Guidelines:

| Group A: | Termination for the first offense, absent mitigating circumstances justifying a less serious penalty. |
| --- | --- |
| Group B: | 1st offense: 3–5 day suspension; termination may be called in for appropriate cases. 2nd offense: 5-day suspension or termination. |
| Group C: | 1st offense: oral, written, or 1-3 day suspension. 2nd offense: 1-5 day suspension. 3rd offense: 5-day suspension or termination. |

[Dkt. 92, ¶ 15.] Pursuant to the CBA, while the Park District generally follows progressive discipline, it may depart from this principle if "an act is sufficiently severe." [*Id.*, ¶ 16.]

If a suspension or discharge may be warranted, a Corrective Action Meeting ("CAM") is scheduled. The CAM is facilitated by the HR Manager. During the CAM, the HR Manager gathers facts and the employee is afforded a chance to respond to allegations of misconduct and present evidence in his defense. The purpose of the CAM is to allow the HR Manager to gather information from the employee and his chosen representative regarding the specific charges and to afford the employee an opportunity to present his side. Following the CAM, the HR Manager may conduct a

3

follow-up investigation based on information provided by the employee. After the CAM, the HR Manager, in consultation with the HR Director and the Park District's Law Department, generates a CAM Notice of Disposition announcing if the charges were sustained, and if so, the discipline that will be imposed. The discipline can range from a written reprimand to termination, depending on the severity of the offense.

Before a career service employee like Rankin can be terminated, he has the right to a hearing before a hearing officer appointed by the Personnel Board. The hearing officer conducts a hearing pursuant to the rules of evidence and issues a recommended decision. A dissatisfied employee can file written exceptions to the recommended decision with the Personnel Board. The Personnel Board rules on the hearing officer's recommended decision and any timely filed exceptions by accepting, rejecting, or modifying the recommended decision. Personnel Board decisions are subject to administrative review in the Circuit Court of Cook County.

About three years after Rankin began his employment with the Park District, he was transferred to Berger Park. (The summary judgment record is largely silent as to Rankin's earlier work history or why he was transferred, although Rankin's brief hints at "personal issues" between himself and his supervisors.) At Berger Park, Plaintiff's supervisor was Ostergaard, a white male born in 1984. On January 28, 2019, Rankin filed an Illinois Department of Human Rights ("IDHR") Charge against the Park District alleging race and age harassment by Ostergaard. [Dkt. 92, ¶ 26.] The parties' Local Rule 56.1 statements provide no details on the factual basis for this charge. The charge attached to the amended complaint indicates that Plaintiff

4

felt that Ostergaard was micro-managing him and being overly critical, which Plaintiff attributed to his race and age. [See Dkt. 27 at 4-5.]

Rankin was on sick leave from his position at Berger Park from April 8 to April 18, 2019. On the afternoon of April 9, 2019, Rankin visited Mandrake Park, which is also managed by the Park District. Rankin had worked at Mandrake Park prior to being reassigned to Berger Park. There is an office building adjacent to Mandrake Park, in which the Park District leases space for its staff offices and indoor programming. The office building is owned by the Chicago Housing Authority ("CHA"). The CHA building has a patron entrance where patrons are required to sign in to enter the facility. The CHA building also has a secure, employee-only entrance in the back of the building. CHA employs security from Skytech Security at the CHA Building. Skytech Security has authority to restrict access to the CHA building.

Mandrake Park's supervisor was Lewis, who is Black and was born in 1979. Lewis began working for the Park District in October 2014 and has been Mandrake Park supervisor since October 2016. As the Mandrake Park Supervisor, Lewis had the authority to restrict access to the CHA Building. [Dkt. 92, ¶ 23.] According to Lewis, he was in his office on the afternoon of April 9, 2019 and heard a "loud" banging sound coming from the employee entrance. [*Id.*, ¶ 28.] Lewis went to the employee entrance and observed Rankin attempting to enter the CHA Building through the employee entrance. Lewis informed Rankin that he was not permitted to enter because he was not a Mandrake Park employee and he had no Park District business to conduct at the building. Rankin refused to leave the employee entrance doorway

5

and insisted that he be permitted to enter. He positioned himself in a way that impeded the closure of the employee entrance door. A verbal and physical confrontation between Lewis and Rankin ensued. During the approximately ten-minute confrontation, Lewis made multiple requests for Rankin to move himself from the employee entrance, which Rankin refused. During the incident, Lewis did not make any comments about Rankin's race or age. Lewis recorded a portion of the confrontation on his cell phone. [Dkt. 93.]

Three other individuals were present during the confrontation: Program and Event Coordinator Thomas Hayes ("Hayes"), who is Black and was born in 1993; Mandrake Park Physical Instructor Charles George ("George"), who is Black and was born in 1994; and Etaria Lyles ("Lyles"), a Skytech Security Officer whose race is not identified in the parties' Local Rule 56.1 materials. During the altercation, Park District staff called the police. The police arrived and ordered Rankin to leave, which he did. [See Dkt. 92, ¶ 30.] A police report was generated.

Following the incident, Lewis drafted an incident report and Lewis, Hayes, George, and Lyles drafted witness statements describing the occurrence with Rankin. According to Lewis' witness statement, after he told Rankin that he needed to leave, Rankin "pushed, bumped, and shoved" Lewis in "an attempt to bulldoze his way into the building." [Dkt. 92, ¶ 32.] According to Hayes' witness statement, he "observed [Lewis] and [Lyles] having words with [Rankin]," and overheard Lyles and Lewis inform Rankin that he was not permitted to enter the CHA Building. [*Id.*] Hayes' witness statement further reported that the interaction went back and forth for "7 to

6

10 minutes," until the police arrived. [*Id.*] According to George's witness statement, Rankin "attempt[ed] to use force to muster his way through [Lewis] as he stood at the door". [*Id.*] According to Lyles' witness statement, upon noticing Rankin at the facility, Lyles advised Rankin that he could not enter the facility. Lyles' witness statement further indicates that Rankin attempted to "push pas[t] Mr. Lewis so [she] stood in between the both of them with hope that Mr. Rankin would leave and allow [her] to close the entry door, but he did not leave." [*Id.*]

Lewis submitted the incident report and witness statements to HR. The matter was assigned to Ortiz. On April 27, 2019, Ortiz prepared a CAM notice based on the incident report, narratives, and police report. Rankin received a copy. The CAM notice advised Rankin that it had been alleged that he "failed to be respectful and polite on Chicago Park District property when he attempted to use aggressive force towards a Park Supervisor on April 9, 2019 which is a violation of the Chicago Park District's Violence in the Workplace Policy." [Dkt. 92 at 9-10.] The CAM Notice cited the following Code of Conduct and Violence in the Workplace policy provisions, which Rankin's conduct allegedly violated:

> Section I (H): An employee shall comply with the policies and procedures of the Chicago Park District and the written policies of his/her department or unit. Policies and procedures of the Chicago Park District include, but are not limited to, any Park District ordinance, any directive of the Board of Commissioners, any Personnel Board Rule, and any directive bulletin or memorandum issued by the General Superintendent.

> Section I(E): An employee shall refrain from committing, attempting or threatening physical violence against another employee or a member of the public while on the work site or while on duty, except in self-defense.

Violence in the Workplace Policy: Aggressive or hostile behavior including but not limited to, threatening remarks, hazing or any activity or gesture that creates a reasonable fear of injury to another person or subjects another person to individual distress.

On July 25, 2019, Ortiz held a CAM, which Rankin attended with his attorney. This was the first time that Rankin had ever spoken to Ortiz. [See Dkt. 92, ¶ 35.] During the CAM, Rankin denied that he bumped, pushed, or shoved Lewis during the April 9, 2019 incident. According to Rankin, he had gone to Mandrake Park to drop off tax papers for the daughter of Mandrake Park Program Facilitator Sandra Young ("Young"). Young denied having knowledge of Rankin ever providing tax documents to her daughter. Rankin further informed Ortiz that he had filed a police report against Lewis concerning the April 9, 2019 incident. Following the CAM, Ortiz contacted Young, obtained the police report generated by Rankin, and obtained documents relating to Rankin's use of sick leave during the period.

On August 13, 2019, Ortiz—with the approval of Simpkins—issued a CAM Disposition terminating Rankin for cause. [Dkt. 92, ¶ 37.] Ortiz took into account the incident report, witness statements, police reports, doctor's note, Rankin's timesheet for the period at issue, and the information obtained during the CAM. Ortiz determined that the weight of the evidence supported Lewis' narrative and contradicted Rankin's description of the April 9, 2019 incident. Ortiz further determined that Rankin's conduct included "Group A" misconduct. In particular, her CAM Disposition identified the following instances of misconduct as the basis for Rankin's termination:

On April 9th, you failed to be respectful and polite on Chicago Park District property when you attempted to use aggressive force towards a Park Supervisor.

You provided the Chicago Park District a doctor's note stating you were unable to work from 4/8-4/18 due to illness. During the CAM, you indicated [sic] going to Mandrake Park on April 9th to complete your taxes which is an abus[e] of sick leave.

[Dkt. 92, ¶ 37.] The CAM Disposition explained further that Rankin's conduct violated certain provisions of the Code, Code of Conduct, and Violence in the Workplace Policy, including:

Code of Conduct Section I(E): An employee shall be respectful and polite in conduct while on duty or on park property.

Code of Conduct Section I(G): An employee shall refrain from committing, attempting or threatening physical violence against another employee or a member of the public while on the work site or while on duty, except in self-defense.

Code of Conduct Section I (H): An employee shall comply with the policies and procedures of the Chicago Park District and the written policies of his/her department or unit. Policies and procedures of the Chicago Park District include, but are not limited to, any Park District ordinance, any directive of the Board of Commissioners, any Personnel Board Rule, and any directive bulletin or memorandum issued by the General Superintendent.

Violence in the Workplace Policy: Aggressive or hostile behavior including but not limited to, threatening remarks, hazing or any activity or gesture that creates a reasonable fear of injury to another person or subjects another person to individual distress.

Park District Code, Ch. 5.B.2.c. Abuse of sick leave, including the furnishing of false information in connection with a sick leave request, failing to submit the appropriate documentation, failing to submit to a physical examination, failing to return to work when such leave has been terminated, or using sick leave for a reason other than those outlined in 2.b.1 of this Code will result in disciplinary action up to and including discharge.

[Dkt. 92, ¶ 37.]

On August 14, 2019, Rankin filed a timely appeal of his termination with the Personnel Board. Five days later, on August 19, 2019, Rankin filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging race and age discrimination and retaliation. Rankin's appeal to the Personnel Board and his EEOC charge proceeded concurrently on separate tracks, with the EEOC's proceedings concluding first. In particular, the EEOC issued Rankin a Right to Sue letter on November 20, 2020, which was before the Personnel Board ultimately decided his appeal.

In connection with his appeal to the Personnel Board, a hearing was held on December 2 and December 9, 2019. Rankin was represented by an attorney. At some point following the hearing, the hearing officer issued the following recommendation:

> I find that the Chicago Park District has established by a preponderance of the evidence that Stanley Rankin violated Section I(E), I(H), and I(G) of the Chicago Park District's Code of Conduct. Rankin also violated the Violence in the Workplace Policy and the Sick Leave Policy. I recommend that the termination be affirmed.

[Dkt. 92, ¶ 38.][1] On November 12, 2021, Rankin filed written exceptions to the hearing officer's findings and recommendation. On December 27, 2022, the Personnel Board voted to adopt the findings and recommendations of the Hearing Officer and upheld Rankin's termination.

---

[1]     The Hearing Officer's findings and recommendations are not dated [see Dkt. 92-1 at 6- 76] and the parties' submissions do not indicate when the Hearing Officer made his decision or communicated it to Plaintiff. [See Dkt. 92-1 at 5, ¶ 11 (Hrysikos declaration).]

## II.    Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); see also *Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted). The Court "'may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder.'" *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)).

Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022) (quoting *Schacht v. Wis. Dept' of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). A party opposing summary judgment must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250. Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

11

bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex,* 477 U.S. at 322). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Liberty Lobby*, 477 U.S. at 252.

## III. Analysis

### A. Local Rule 56.1

Local Rule 56.1 governs summary judgment practice in this district. See generally *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). Defendants filed a Local Rule 56.1 statement along with their summary judgment motion, as required by Local Rule 56.1. [See Dkt. 92.] Local Rule 56.1 requires a party opposing a summary judgment motion (here, Rankin) to file a concise response to the movant's Local Rule 56.1 statement. See L.R. 56.1(b)(2), (e). "To dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." L.R. 56.1(e)(3). The party opposing summary judgment may also file his own statement of additional material facts, if he wishes to assert facts not set forth in the movant's statement. L.R. 56.1(b)(3). Rankin also received the Local Rule 56.2 notice that is provided to all unrepresented litigants. [See Dkt. 95.]

In his Local Rule 56.1 response, Rankin largely does not dispute the facts set out in Defendant's Local Rule 56.1 statement. In particular, he "agrees" with paragraphs 1 through 27 of Defendant's statement, as well as paragraph 38. [Dkt. 106 at 1.] Rankin "can neither agree nor disagree" with paragraphs 33 through 37, which concern the Park District's human resources investigation and his termination. [See *id.* at 2.] Because Rankin cites nothing in the record to explain his lack of information, and thus his inability to confirm or deny the facts alleged in those paragraphs, those facts are deemed admitted to the extent they are supported by the record materials cited by Defendants. *Rodriguez. v. City of Berwyn*, 2018 WL 5994984, at *1 (N.D. Ill. Nov. 15, 2018). Rankin disputes only paragraphs 28 through 32, which concern the incident at Mandrake Park that precipitated his termination. [Dkt. 106 at 2.] But Rankin does not cite any evidentiary material to controvert Defendants' facts or explain the basis for his disagreement. All he says is that he "disagrees with the statements alleged" in those paragraphs. [*Id.*] Rankin also chose not to file a statement of additional material facts.

The Seventh Circuit "has repeatedly recognized that district courts may require exact compliance with their local rules," including the "local rules governing summary judgment." *Allen-Noll v. Madison Area Tech. Coll.*, 969 F.3d 343, 349 (7th Cir. 2020) (collecting cases). Consistent with the purpose of Local Rule 56.1, however, the Court has "broad discretion" to relax or enforce strictly local rules governing summary judgment practice. *Edgewood Manor Apt. Homes, LLC v. RSUI Indem. Co.*, 733 F.3d 761, 770 (7th Cir. 2013) (citing *Modrowski v. Pigatto*, 712 F.3d 1168, 1169

(7th Cir. 2013)); *see also Cracco*, 559 F.3d at 632. Because the Court prefers to decide cases on the merits, not on technicalities, it considers the arguments Rankin raises to the greatest extent possible. As the analysis below indicates, however, Rankin's agreement with most of Defendants' asserted facts, along with his decision not to file a statement of additional material facts, means that the record is devoid of evidence tying the Park District's decision to terminate him to his race, age, or any protected activity in which he engaged, which is fatal to his claims.

### B.    Race Discrimination

Rankin brings race discrimination claims against the Park District based on Title VII and against the individual Defendants based on § 1983 and § 1981. In general, the same standards govern intentional discrimination claims under all of these statutes. *Sommerfield v. Knasiak*, 967 F.3d 617, 622 (7th Cir. 2020); *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1114 n.3 (7th Cir. 2009). Under Title VII, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). An employer violates Title VII if it "intentionally relies in part" on an individual employee's membership in a protected class when the employee makes an adverse employment decision. *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1741, 590 U.S. -- (2020). Put differently, "if changing the employee's" race or other protected characteristic "would have yielded a different choice by the employer," then "a statutory violation has occurred." *Id*. Under § 1981 and § 1983, "individual liability

14

is possible if [a] subordinate employee, motivated by unlawful discriminatory intent, caused the nominal actors to take the adverse action," which "can happen, for example, if the evidence shows that the nominal decisionmakers played no real role in the action, but instead simply rubber-stamped the action of the subordinate." *Sommerfield v. Knasiak*, 967 F.3d 617, 621 (7th Cir. 2020).

The summary judgment record shows that Rankin is a member of a protected class based on his race (Black) and that he suffered an adverse employment action—termination. Causation is the only element for the Court to resolve. At summary judgment, the question is "whether the evidence would permit a reasonable factfinder to conclude that the Rankin's race "'caused the discharge or other adverse employment action.'" *Wince v. CBRE, Inc.*, 66 F.4th 1033, 1040 (7th Cir. 2023) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)); see also *Nigro v. Indiana Univ. Health Care Assocs., Inc.*, 40 F.4th 488, 491 (7th Cir. 2022); *Purtue v. Wisc. Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020). Rankin can establish causation using the burden-shifting method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or in a holistic manner under *Ortiz*, 834 F.3d 760. See *Riley*, 829 F.3d at 891-92. In their opening brief, Defendants analyze the case under both *McDonnell Douglas* and *Ortiz*. In his response to summary judgment, Rankin does not address either method—or even mention race or age—instead focusing on a few discrete factual disputes surrounding his termination. The Court agrees with Defendants that Rankin fails to meet his burden under *McDonnell Douglas* or *Ortiz*.

15

Under the *McDonnell Douglas* burden shifting framework, the plaintiff has the "initial burden to establish a *prima facie* case of discrimination" by showing that 1) he is a member of a protected class; 2) he was meeting his employer's legitimate job expectations; 3) he suffered an adverse employment action; and 4) similarly situated employees outside his protected class were treated more favorably. *Wince*, 66 F.4th at 1040. If the plaintiff meets this burden, the "burden shifts to the defendant to provide a legitimate justification, before finally shifting back to the plaintiff to establish that such justification was pretextual.'" *Wince*, 66 F.4th at 1040 (quoting *Dunlevy v. Langfelder*, 52 F.4th 349, 353 (7th Cir. 2022)).

Under this framework, Rankin's race discrimination claims are a non-starter due to his inability to identify any similarly situated employee outside his protect class who was treated more favorably than him. Rankin questions why he was fired and Lewis was not, even though "both adults chose to engage in childish behavior and the identity of the initiating aggressor remains in dispute." [Dkt. 105 at 2.] But Lewis is in the same protected class as Rankin; both are Black. Ostergaard cannot be used as a comparator, either. Though he is white, the summary judgment record contains essentially no evidence concerning Ostergaard—and certainly no evidence that Ostergaard was ever involved in a physical and verbal altercation with another employee but was allowed to keep his job.

Even if Rankin could establish a *prima facie* case of race discrimination, he fails to rebut the Park District's showing that it had a valid reason to terminate him and fails to come forward with sufficient evidence that the Park District's decision

was a pretext for discrimination. "Pretext is a lie, specifically a phony reason for some action." *Fischer v. Avanade, Inc.*, 591 F.3d 393, 403-404 (7th Cir. 2008) (internal quotation marks and citations omitted). Thus, "to show pretext, a plaintiff must show that (1) the employer's nondiscriminatory reason was dishonest, and (2) the employer's true reason was based on a discriminatory intent." *Id.* "Pretext does not exist if the decisionmaker honestly believed the nondiscriminatory reason given by an employer for an adverse employment action." *Downing v. Abbott Laboratories*, 48 F.4th 793, 804-05 (7th Cir. 2022) (internal quotation marks and citations omitted). "So, in evaluating pretext, the focus is on what the decisionmakers knew, and their perceptions are 'controlling.'" *Id.* (quoting *Stockwell v. City of Harvey*, 597 F.3d 895, 902 (7th Cir. 2010)). "[T]he pretext inquiry turns on honesty, not correctness, and even if we assume a less severe punishment might have been more appropriate, that fact does not, without more, provide evidence of pretext." *Liu v. Cook County*, 817 F.3d 307, 318 (7th Cir. 2016).

In this case, the decisionmakers were Ortiz, the HR Manager who made the August 13, 2019 decision to terminate Rankin's employment, and Simpkins, the HR Director who approved Ortiz's decision. In his response to summary judgment, Rankin does not mention Ortiz and Simpkins or offer any information on whether they honestly believed that he engaged in a terminable offense. He simply argues that, "given the circumstances a reasonable jury would conclude and agree that Defendants actually did not have a proper justification for termination outside of suspected personal issues and past issues between Rankin and Ostergaard and

17

similarly between Rankin and Lewis." [Dkt. 105 at 1.] Rankin questions whether the story Lewis told HR—portraying Rankin as the aggressor—was entirely accurate. But this is not sufficient to show that the reasons Ortiz and Simpkins provided for the termination were dishonest or that Ortiz and Simpkins harbored any discriminatory bias. See *Simpson v. Beaver Dam Cmty. Hosps.*, Inc., 780 F.3d 784, 795 (7th Cir. 2015) ("[t]he question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain its decision" (internal citation and quotation marks omitted)); *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 940 (7th Cir. 2003) ("[i]t was up to Adams to produce evidence showing that Wal-Mart did not genuinely believe that she had" stolen the money—not simply that the "investigators might have made a mistake in their conclusion").

The Court recognizes that a plaintiff "may prevail—even without showing that the ultimate decisionmaker harbored discriminatory bias—by invoking the cat's paw theory of liability." *Sinha v. Bradley University*, 995 F.3d 568, 573 (7th Cir. 2021); see also *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011); *Brewer v. Board of Trustees of University of Illinois*, 479 F.3d 908, 917 (7th Cir. 2007). Under this theory, "where an employee without formal authority to materially alter the terms and conditions of a plaintiff's employment" (like Lewis) "nonetheless uses h[is] 'singular influence' over an employee who does have such power to harm the plaintiff for racial reasons, the actions of the employee without formal authority are imputed to the employer and the employer is in violation of Title VII." *Brewer*, 479 F.3d at 917. However, "[a]n

18

employer may avoid cat's-paw liability if 'the decisionmaker is not wholly dependent on a single source of information and conducts her own investigation into the facts relevant to the decision.'" *Sinha*, 995 F.3d at 574 (quoting *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 370 (7th Cir. 2019)). "So long as 'the employer's investigation results in an adverse action for reasons unrelated to the [other employee's] original biased action ... the employer will not be liable.'" *Id.* (quoting *Staub*, 562 U.S. at 421).

In this case, Rankin has not developed a cat's paw theory of liability and the undisputed evidence in the record would not support one. There is no evidence that Lewis (who would be the "cat," in this analogy) harbored any discriminatory animus toward Rankin because of his race, got into the altercation with Rankin because of his race, or exercised any influence over the HR process to have Rankin terminated due to his race. Rankin's response brief hints at "suspected personal issues and past issues between Rankin and Ostergaard and similarly between Rankin and Lewis." [Dkt. 105 at 1.] But Rankin has not introduced any evidence into the summary judgment record about any past "personal issues" between him and either Lewis or Ostergaard. Rankin provides no hint that any of those issues involved his race. Rankin simply disputes how, exactly, the altercation at Mandrake Park unfolded. For instance, Rankin disputes paragraph 28 of Defendants' Local Rule 56.1 statement, which says that Lewis heard "banging," which prompted him to go to the employee entrance. Rankin points to (1) a memo prepared by security on the same day of the incident, which said that Lewis "was alerted by building security that Stanly Rankin

was trying to access the building through the locked door" and (2) Young's testimony that she did not hear banging. [Dkt. 105 at 3-4.] Assuming this is an inconsistency, Rankin does not explain how it is material or how it shows that the reasons given for Rankin's termination were a lie. It is undisputed that Lewis, as the Mandrake Park Supervisor, had the authority to restrict access to the CHA Building. [Dkt. 92, ¶ 23.] There is no dispute that Rankin went to the Mandrake Park CHA building and sought to enter the secured employee entrance, that Lewis said he could not enter, and that an altercation with Lewis ensued.

Further, there is no evidence that Ortiz or Simpkins (the "paws") harbored any racial bias themselves, or depended solely on Lewis' side of events in deciding that terminating Rankin was appropriate. *Sinha*, 995 F.3d at 574. Instead, the record shows that they "conduct[ed] [their] own investigation into the facts relevant to the decision." *Id.* Rankin admits that the discipline he received complied with the Park District's Disciplinary Guidelines and the CBA applicable to his employment. [See Dkt. 106 at 1 (admitting to paragraphs 13-20 of Defendants' L.R. 56.1 statement).] The evidence demonstrates that Ortiz and Simpkins made good faith findings that Rankin committed Group A misconduct during his confrontation with Lewis, which warranted termination for the first offense. Ortiz determined that Rankin's conduct violated the Park District's Code, Code of Conduct, and Violence in the Workplace Policy. [See *id.* at 1-2 (agreeing with paragraphs 12, 32 and 38 and offering no objection to paragraph 37 of Defendants' L.R. 56.1 statement).]

The Park District's decision to terminate Rankin was based on documentary evidence that included not only Lewis' statement, but also eyewitness statements from Hayes, George, and Lyles, as well as a police report. The evidence indicated that, while Rankin was off work and on paid sick leave from his Berger Park position, he ignored directives from Lewis and building security and attempted to enter the restricted employee entrance at the CHA Building. [*Id.*] Following Rankin's termination and a two-day appeal hearing, an independent hearing officer recommended that Rankin's termination be upheld. This recommendation was adopted by the Park District's Personnel Board. [*Id.* at 2 (admitting to paragraph 38 of Defendants' L.R. 56.1 statement).]

Finally, Rankin questions whether his purported "abuse of sick leave" provided another valid basis for the Park District's decision to terminate him. Rankin argues that this is an "innocuous infraction," and that he did not violate the policy's "sub-conditions"—failure to submit appropriate documentation, submit to a physical examination, or return to work when leave was terminated. [Dkt. 105 at 4-5.] But Rankin ignores that Park District Code, Ch. 5.B.2.c., also considers it an abuse of sick leave to "us[e] sick leave for a reason other than those outlined in 2.b.1." [Dkt. 92, ¶ 37.]. Section 2.b.1 provides that sick leave may only be used for illness, disability (including disability due to pregnancy) or injury of the employee, their spouse or dependent child, or appointments with doctors, dentists, or other professional medical practitioners. [*Id.* at 12, n.1.] Rankin was at Mandrake Park while on sick leave in connection with his taxes, which is not one of the uses provided for in section 2.b.1.

Even if the Park District made a mistake by concluding that he abused his sick leave, there is no evidence that Ortiz and Simpkins did not honestly believe that Plaintiff violated the policy or that their decision was a pretext for racial discrimination.

In sum, the Park District has shown that it had a legitimate, non-discriminatory basis for terminating Rankin's employment. Rankin has not identified any evidence that calls into doubt that Ortiz and Simpkins honestly believed that his termination was warranted and therefore cannot prove his case under the *McDonnell Douglas* framework. See *Dickerson v. Walgreen Co.*, 345 F. App'x 178, 180 (7th Cir. 2009) (violation of company policy is a legitimate, non-discriminatory reasons for termination); *Morrow v. Wal-Mart Stores, Inc.*, 152 F.3d 559, 561 (7th Cir. 1998) (violation of company's sexual harassment policy was legitimate, non-discriminatory reason for terminating Rankins).

As an alternative to the *McDonnell Douglas* framework, a plaintiff "may prove discrimination in a holistic fashion, by proffering 'direct or circumstantial evidence of intentional racial discrimination.'" *Wince*, 66 F.4th at 1040 (quoting *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 (7th Cir. 2016)). The Seventh Circuit has "identified three broad types of circumstantial evidence that will support an inference of intentional discrimination: ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Joll v. Valparaiso Community Schools*, 953 F.3d 923, 929 (7th Cir. 2020). Under *Ortiz*, the Court looks at all of the evidence together and asks simply "whether the evidence

would permit a reasonable factfinder to conclude that the Rankin's [membership in a protected class] ... caused the discharge or other adverse employment action" at issue. 834 F.3d at 765.

Viewing the summary judgment record through a holistic lens does not save Rankin's race discrimination claims under Title VII, § 1981, or § 1983. He offers no direct or circumstantial evidence suggesting that he was fired because of his race: no direct statements tying the termination decision to his race; no ambiguous or suggestive comments concerning race; no similarly situated, non-Black employees who engaged in similar misconduct but were not terminated; and no evidence that he was fired as a pretext for race discrimination, rather than because the decisionmakers honestly thought that he engaged in a terminable offense. Assessing the evidence as a whole, no reasonable factfinder could conclude that the Park District terminated Rankin because of his race. *Ortiz*, 834 F.3d at 765. Defendants are entitled to summary judgment on Plaintiff's Title VII, § 1981, and § 1983 race discrimination claims.

### C.    Age Discrimination

In addition to his race discrimination claims, Rankin brings an ADEA age discrimination claim against the Park District. Similar to Title VII, the ADEA protects employees over the age of 40 from employment discrimination. See 29 U.S.C. § 623(a)(1). However, "in the ADEA context, it's not enough to show that age was *a* motivating factor. The plaintiff must prove that, but for his age, the adverse action would not have occurred." *Martino v. MCI Commc'ns Serv., Inc.*, 574 F.3d 447, 455

(7th Cir. 2009). "In this respect, the ADEA is narrower than Title VII ... as Title VII also protects against mixed-motive discrimination." *Carson,* 865 F.3d at 532; see also *Gross v. FBL Financial Services, Inc.*, U.S. 167, 174 (2009); *Marnocha v. St. Vincent Hospital and Health Care Center, Inc.*, 986 F.3d 711, 718 (7th Cir. 2021); *Skiba v. Illinois Central Railroad Co.*, 884 F.3d 708, 719 (7th Cir. 2018). Causation for an ADEA claim may be established holistically or using the *McDonnell Douglas* burden shifting method. See *Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020).

Rankin's age discrimination claim is deficient for essentially the same reasons as his race discrimination claims. Rankin's claim fails under *McDonnell Douglas* because he does not rebut the Park District's showing that it had a legitimate, nondiscriminatory reason to terminate him. His claim fares no better under *Ortiz*, because he makes no attempt to identify any direct or circumstantial evidence tying the Park District's decision to terminate him to his age. Therefore, the Park District is entitled to summary judgment on the ADEA claim, too.

### D.    Retaliation

Finally, Rankin brings a retaliation claim against the Park District under Title VII. To succeed on a Title VII retaliation claim, a plaintiff must "present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (citing *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 687 (7th Cir. 2010)). Like a Title VII discrimination claim, a Title VII retaliation claim may be proven using the *McDonnell Douglas* burden-shifting

method or the *Ortiz* holistic method. See *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 885 (7th Cir. 2018). "The key question is whether a reasonable juror could conclude that there was a causal link between the protected activity or status and the adverse action." *Rozumalski v. W.F. Baird & Associates, Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019).

The summary judgment record shows that on January 28, 2019—approximately seven months before he was terminated—Rankin engaged in protected activity when he filed an IDHR Charge against the Park District alleging race and age harassment by Ostergaard. [Dkt. 92, ¶ 26.] But like with his race discrimination claims, Rankin has no evidence of causation. Rankin does not argue, let alone provide any evidence suggesting, that Ortiz or Simpkins knew about or took into account his IDHR Charge when they decided to terminate him, or that they did not honestly believe that he engaged in a terminable offense. The only evidence Rankin has is timing.

"[F]or a suspicious-timing argument alone to give rise to an inference of causation, the plaintiff must demonstrate that 'an adverse employment action follows close on the heels of protected expression'"—typically "no more than a few days—and the plaintiff [must] show that the person who decided to impose the adverse action knew of the protected conduct." *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) (quoting *Lalvani v. Cook Cnty.*, 269 F.3d 785, 790 (7th Cir. 2001)); see also *Kotaska v. Federal Express Corp.*, 966 F.3d 624, 633 (7th Cir. 2020) (cautioning that "close timing alone is rarely enough to raise a triable claim of retaliation"; "[t]here

25

must be other circumstantial evidence of retaliation"); cf. *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) ("The mere fact that one event preceded another does nothing to prove that the first event caused the second . . . Rather, other circumstances must also be present which reasonably suggest that the two events are somehow related to one another."). Under Seventh Circuit precedent, it would be far too speculative to infer a retaliatory motive solely from the fact that Rankin was fired approximately seven months after filing an EEOC Charge. And that is the only evidence of retaliation that Rankin has, entitling the Park District to summary judgment on the Title VII retaliation claim.

## IV. Conclusion

Defendants' motion for summary judgment [Dkt. 90] is granted. Judgment is entered in favor of Defendants and against Rankin on all remaining counts of Rankin's amended complaint.

Enter: 20-cv-794
Date: September 18, 2023

_____
Lindsay C. Jenkins
United States District Judge

26